ROSENBAUM, Circuit Judge:
*1315 Voting is the beating heart of democracy. It is a "fundamental political right, because [it is] preservative of all rights." Yick Wo v. Hopkins , 118 U.S. 356, 370, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). "It is beyond cavil that 'voting is of the most fundamental significance under our constitutional structure.' " Burdick v. Takushi , 504 U.S. 428, 433, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) (quoting Ill. Bd. of Elections v. Socialist Workers Party , 440 U.S. 173, 184, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979) ).
League of Women Voters of Fla., Inc. v. Detzner , 314 F.Supp.3d 1205, 1215 (N.D. Fla. 2018). We can't say it any better than that. But, of course, voting alone is not enough to keep democracy's heart beating. Legitimately cast votes must then be counted.
This case requires us to consider Florida's practice of counting vote-by-mail ballots only after verifying that the voter's signature provided with the ballot matches the voter's signature in the state's records. Although this practice is designed to prevent fraud, signature mismatches occur for a variety of reasons-including purely innocent ones. And Florida's lack of any standards or formal training requirements for those who assess the signatures as mismatched can also contribute to false positives for signature mismatches. So the fact that a Florida election official may decide a voter's signature provided with her ballot does not match her signature in the state's records does not necessarily mean her vote is fraudulent and should not be counted.
But Florida's election code allows for just that. Because of the way Florida has scheduled its election process, some voters who submit a vote-by-mail ballot by the stated deadline are not notified about a signature mismatch until after it is too late to demonstrate their eligibility to vote. As a result, their votes do not count, and they are disenfranchised.
Upon Plaintiffs-Appellees the Democratic Executive Committee of Florida ("DECF") and Bill Nelson for U.S. Senate's (the "Nelson Campaign") motion, the district court here entered an order providing these voters with a 48-hour period to cure their signature mismatch, so their votes could be counted. Defendants-Appellants the National Republican Senatorial Committee ("NRSC"), the Florida Secretary of State[2] ("Secretary"), and the Florida Attorney General ("Attorney General") appealed the district court's order, and the NRSC sought an emergency stay of the order.
In this opinion, we address only the NRSC's motion for emergency stay. Because the NRSC has not satisfied the requirements for the issuance of a stay in this case, we deny its motion.[3]
*1316 I. Background[4]
Florida allows eligible voters to cast their votes by mailing in their ballots rather than voting in person on Election Day. See Fla. Stat. § 101.62 (2016). This option can be especially useful to those temporarily residing away from home, such as college students, and those with physical impairments that make it difficult to get around.
To protect against fraud, Florida requires those who choose to vote by mail to sign the voter's certificate on the back of the envelope on which they mail their ballots. Fla. Stat. § 101.65 (2016). Voting officials later compare the signature on the certificate with the signature on file for that voter. Fla. Stat. § 101.68 (2017). If the reviewing official believes the signatures do not match, the ballot is rejected. Id.
For a period, Florida did not afford voters whose ballots were rejected due to signature mismatch the opportunity to cure their votes by proving their identities. See Fla. Democratic Party v. Detzner , No. 4:16CV607-MW/CAS, 2016 WL 6090943, at *2 (N.D. Fla. Oct. 16, 2016). But the signature-match scheme calls on officials who are not required to receive formal training to judge the similarities of signatures, and everyday factors "such as body position, writing surface, and noise" all affect one's signature. Id. at *2, 7. So the signature-match scheme can result in the rejection of an eligible voter's ballot, through no fault of the voter. Id. at *8.
The shortcomings of the signature-match scheme made it nearly certain to incorrectly reject the ballots of some legitimate voters. As a result, a district court in Florida (the same one that ruled in the case now under review) held that the scheme would unconstitutionally disenfranchise legitimate voters and ordered the state to provide a way for those voters who had their ballots rejected for signature mismatch to prove their identities and have their votes count. Id. at *9.
In response to the district court's decision, the Florida legislature amended the election code to allow voters to cure improperly rejected ballots. After that amendment, a voter, upon learning that her vote had been rejected for signature-mismatch, had until 5 p.m. one day before the election to verify her identity by submitting a cure affidavit and an accepted form of identification. Fla. Stat. § 101.68(4). Working in tandem, the cure provision and the original signature-match requirement were supposed to guard against both vote-by-mail fraud and arbitrary disenfranchisement of legitimate voters.
Florida also allows prospective voters who cannot prove their eligibility to vote to cast provisional ballots. Fla. Stat. § 101.048(1) (2008). Like vote-by-mail ballots, provisional ones are also protected by the signature-match requirement: if the signature on the provisional ballot voter's certificate and affirmation does not match the signature on the voter's registration, the ballot will not count. Id. § 101.048(2)(b) 1. But unlike for vote-by-mail ballots, Florida does not provide a way for provisional voters whose ballots were rejected for signature mismatch to cure their ballots.[5] Democratic Exec. Comm. of Fla. v. Detzner , 347 F.Supp.3d 1017, 1024 (N.D. Fla. 2018).
*1317 Plaintiffs DECF and the Nelson Campaign challenged the constitutionality of the signature-match scheme as it relates to vote-by-mail and provisional voters. They asserted that the scheme continues to disenfranchise eligible voters on an arbitrary basis, in violation of the First and Fourteenth Amendments. As relevant here, Plaintiffs asked the district court for an emergency injunction requiring officials to stop rejecting ballots based on signature mismatch and to count every vote-by-mail and provisional vote that had been rejected for that reason.
The district court agreed that the signature-match protection provided by Florida's amended election laws still blocked too many eligible voters. But rather than granting plaintiffs' request to count every vote-by-mail and provisional ballot that had been rejected for signature mismatch, the district court issued a much narrower preliminary injunction: under it, only the ballots of those voters who were belatedly notified of signature mismatch could be counted, and they would be counted only after those voters timely verified their identities by following the normal cure procedures. See Democratic Exec. Comm. , 347 F.Supp.3d at 1032.
Defendants the NRSC, the Secretary, and the Attorney General appealed. The NRSC also sought an emergency stay of the district court's preliminary injunction.
II. Legal Standard
A stay of a preliminary injunction requires the exercise of our judicial discretion, and the party requesting the stay must demonstrate that the circumstances justify the exercise of that discretion. In considering a motion for stay, we account for the following factors, which substantially overlap with the factors governing preliminary injunctions: (1) whether the stay applicant has made a strong showing that it is likely to succeed on the merits, (2) whether the applicant will be irreparably injured absent a stay, (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding, and (4) where the public interest lies. Nken v. Holder , 556 U.S. 418, 434, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009).[6] The first two factors are the most critical. Id. at 434-35, 129 S.Ct. 1749. To satisfy its burden as to those factors, the party seeking the stay must show more than the mere possibility of success on the merits or of irreparable injury. Id .
In considering whether to stay a preliminary injunction, we apply the usual standards of review governing our review of the merits of the preliminary injunction. See U.S. Student Ass'n Found. v. Land , 546 F.3d 373, 380 (6th Cir. 2008). So we examine the district court's grant of the preliminary injunction for abuse of discretion, reviewing de novo any underlying legal conclusions and for clear error any findings of fact. See id. ; Transcon. Gas Pipe Line Co., LLC v. 6.04 Acres, More or Less, Over Parcel(s) of Land of Approximately 1.21 Acres, More or Less, Situated in Land Lot 1049 , 910 F.3d 1130, 1163 (11th Cir. 2018).
*1318 After careful consideration, we deny the NRSC's motion to stay the preliminary injunction.
III. The Nken factors militate against a stay of the preliminary injunction.
Before jumping into our application of the Nken factors, we begin by noting that Plaintiffs properly sued the Secretary in her official capacity when they asserted that Florida's signature-match regime imposed an undue burden on the right to vote. "A state official is subject to suit in his official capacity when his office imbues him with the responsibility to enforce the law or laws at issue in the suit." Grizzle v. Kemp , 634 F.3d 1314, 1319 (11th Cir. 2011). Here, of course, the signature-matching provisions of the election laws-including the provisions that enabled belated notice of mismatch to voters-were at issue. Because the Secretary is the state's chief election officer with the authority to relieve the burden on Plaintiffs' right to vote, she was appropriately sued for prospective injunctive relief. Fla. Stat. § 97.012 (2016) ; Fla. Democratic Party , 2016 WL 6090943, at *4-5 ; see also Ex parte Young , 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) ; Grizzle , 634 F.3d at 1319.
With that established, we now apply the Nken factors to determine whether the NRSC is entitled to a stay of the district court's preliminary injunction.
A. The first Nken factor disfavors a stay because the NRSC has not made a strong showing that it is likely to succeed on appeal.
We begin with whether the NRSC has demonstrated a strong likelihood of success on the merits of appeal. Here, the NRSC has not made a strong showing that it is likely to succeed on appeal, either on the merits of the constitutional claim or on its laches argument.
i. The NRSC has not made a strong showing that the burden imposed on the right to vote is constitutional as judged by the Anderson-Burdick balancing test.
Plaintiffs DECF and the Nelson Campaign challenged the constitutionality of the signature-match scheme as it relates to vote-by-mail and provisional voters, on the basis that the scheme violates the prohibition against undue burdens on the right to vote, as embodied in the First and Fourteenth Amendments.[7] We evaluate the constitutionality of a challenged election law by applying the Anderson - Burdick test. Anderson v. Celebrezze , 460 U.S. 780, 789, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983) ; Burdick v. Takushi , 504 U.S. 428, 434, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992). That test requires us to weigh the character and magnitude of the asserted First and Fourteenth Amendment injury against the state's proffered justifications for the burdens imposed by the rule, taking into consideration the extent to which those justifications require the burden to plaintiffs' rights. See Anderson , 460 U.S. at 789, 103 S.Ct. 1564 ; Burdick , 504 U.S. at 434, 112 S.Ct. 2059.
A law that severely burdens the right to vote must be narrowly drawn to serve a compelling state interest. Burdick , 504 U.S. at 434, 112 S.Ct. 2059. And even when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight *1319 still must justify that burden. Common Cause/Ga. v. Billups , 554 F.3d 1340, 1352 (11th Cir. 2009). The more a challenged law burdens the right to vote, the stricter the scrutiny to which we subject that law. Stein v. Ala. Sec. of State , 774 F.3d 689, 694 (11th Cir. 2014).
a. Burden Imposed by the Signature-match Scheme on the Right to Vote
We begin our analysis by identifying the burden that Florida's signature-match scheme imposes on the right to vote. Here, the burden falls on vote-by-mail and provisional voters' fundamental right to vote. The Supreme Court has long recognized that burdens on voters implicate fundamental First and Fourteenth Amendment rights. See Anderson , 460 U.S. at 787 n.7, 103 S.Ct. 1564. Specifically, voters have a First Amendment right "to associate for the advancement of political beliefs"-a freedom likewise protected by the Fourteenth Amendment "from infringement by the states." Williams v. Rhodes , 393 U.S. 23, 30-31, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968) ; see also Swanson v. Worley , 490 F.3d 894, 902 (11th Cir. 2007).[8] They also enjoy a Fourteenth Amendment right "to participate equally in the electoral process." See Swanson , 490 F.3d at 902.
To establish an undue burden on the right to vote under the Anderson - Burdick test, Plaintiffs need not demonstrate discriminatory intent behind the signature-match scheme or the notice provisions because we are considering the constitutionality of a generalized burden on the fundamental right to vote, for which we apply the Anderson - Burdick balancing test instead of a traditional equal-protection inquiry.[9] See , e.g. , Anderson , 460 U.S. at 806, 103 S.Ct. 1564 (showing that, even without proof of discriminatory intent, a state's early filing deadline was still an impermissible burden since it was insufficiently justified by legitimate state interests); Obama for America v. Husted , 697 F.3d 423, 429-30 (6th Cir. 2012) (rejecting calls to apply "a straightforward equal protection analysis" and explaining that "when a state regulation is found to treat voters differently in a way that burdens the fundamental right to vote, the Anderson - Burdick standard applies").
Here, Florida's signature-match scheme subjects vote-by-mail and provisional electors to the risk of disenfranchisement in two ways. First, problems occur because of the way in which Florida implements the scheme. And second, deficiencies arise because of the very nature of matching signatures.
With respect to Florida's execution of the signature-match requirement, Florida has not enacted uniform standards for matching signatures, nor has it created qualifications or training for those who engage in the job. Indeed, election officials in Florida tasked with comparing signatures on ballots to those on file need not *1320 undergo formal training in handwriting analysis or receive formal guidelines for how to compare signatures. Democratic Exec. Comm. , 347 F.Supp.3d at 1023. And Florida allows each county to apply its own standards and procedures for executing the signature-match requirement, virtually guaranteeing a crazy quilt of enforcement of the requirement from county to county. Id. at 1030 & n.5. While some counties may make Herculean efforts to ensure that legitimate vote-by-mail or provisional votes, or both, are counted, other counties may do very little to ensure even and accurate application of the signature-match requirements. See id. Florida's scheme prohibits neither.
And even if election officials uniformly and expertly judged signatures, rightful ballots still would be rejected just because of the inherent nature of signatures. Citing a declaration by Dr. Linton A. Mohammed, a certified forensic document examiner, the DECF and the Nelson Campaign presented evidence that innocent factors like the writer's body position, writing surface, type of pen, and mental and physical states, as well as the surrounding noise, can alter a person's signature and produce mismatches. Consequently, legitimate vote-by-mail and provisional voters, through factors out of their control, are burdened with the risk that their ballots will incorrectly be rejected for signature mismatch.
Recognizing this problem, in a 2016 case before the same district court that entered the preliminary injunction now under review, the district court tried to remedy the deficiencies in Florida's signature-match scheme by mandating that those with mismatched-signature ballots be given a chance to cure. Fla. Democratic Party , 2016 WL 6090943, at *9. In response to the court's order, the Florida legislature codified a cure provision into the election code. But as it turned out, the changes did not adequately address the scheme's shortcomings.
Heading into the 2018 election, Florida law provided that the deadline for the supervisor of elections to receive vote-by-mail ballots was 7 p.m. on the day of the election. Fla. Stat. § 101.6103(2) (2008). Even though the opportunity to cure signature mismatch should have been part and parcel of any constitutional use of the signature-match protection after the district court's 2016 opinion, Florida required a cure to be submitted by 5 p.m. on the day before the election-meaning that the deadline to cure a rejected ballot came before the deadline for the supervisor to receive the ballot in the first place. Fla. Stat. § 101.68(4)(a). And even more problematically, the law did not require canvassing boards to even begin the canvassing of vote-by-mail ballots and check for signature match before noon on the day after the election.[10] Id. § 101.68(2)(a) ("The *1321 county canvassing board may begin the canvassing of vote-by-mail ballots at 7 a.m. on the 15th day before the election, but not later than noon on the day following the election."). So voters whose signatures were deemed a mismatch might not learn that their vote would not be counted until it was too late to do anything about it.
That is exactly what happened to former U.S. Congressman Patrick Murphy. A registered voter, Murphy explained in a sworn declaration to the district court that he voted by mail using the same signature that he had used in the 2018 primary election in Florida. Although Murphy had no issues with his signature before, Murphy's ballot was rejected for mismatched signature on Election Day. Because the cure deadline had already passed, Murphy could do nothing to have his ballot counted. And Murphy was not alone: the record contains other sworn declarations with stories of eligible voters who were similarly disenfranchised.
On these facts, we have no trouble finding that Florida's scheme imposes at least a serious burden on the right to vote.[11] See League of Women Voters of N. Carolina v. North Carolina , 769 F.3d 224, 244 (4th Cir. 2014) (commenting that it is a "basic truth that even one disenfranchised voter-let alone several thousand-is too many"). This burden can be constitutional only if justified by legitimate state interests of sufficient weight.
b. The State's Asserted Justifications for the Burden
We therefore turn to the state's interests. In considering the state's interests, we account for the points the NRSC raises here as well as those raised by the Secretary and Attorney General before the district court. The identified interests fall into three general categories: preventing fraud;
*1322 promoting the orderly, efficient, and timely administration of the election; and ensuring fairness and public confidence in the legitimacy of the election.
We begin with Florida's interest in combatting voter fraud and making certain that only legitimate votes are counted. Without a doubt, Florida has a legitimate and strong interest in preventing voter fraud. Common Cause , 554 F.3d at 1353-54. But that interest is not mutually exclusive of vote-by-mail and provisional voters' interest in not being disenfranchised through no fault of their own.
And that's the problem for Defendants. We must take into consideration not only the "legitimacy and strength" of the state's asserted interest, but also "the extent to which those interests make it necessary to burden" voting rights. Anderson , 460 U.S. at 789, 103 S.Ct. 1564 (emphasis added). Here, Defendants offer no satisfying explanation for why Florida cannot have both a robust signature-match protection and a way to allow every eligible vote-by-mail and provisional voter whose ballot is mistakenly rejected an opportunity to verify their identities and have their votes count. Indeed, if a voter is able to cure the signature-match problem, no fraud protected against by the signature-match provision even arguably occurs. So even without requiring the state to engage in narrow tailoring-that is, saying nothing about Florida's lack of uniform training or standards from county to county[12] -Defendants have identified no fraud-prevention interest that justifies depriving legitimate vote-by-mail and provisional voters of the ability to cure the signature mismatch, thereby disenfranchising them.
Next, we turn to Florida's interest in the orderly, efficient, and quick administration of an election. Again, we agree that Florida has an important interest in structuring and regulating its elections to avoid chaos and to promote the smooth administration of its elections. See Burdick , 504 U.S. at 433, 112 S.Ct. 2059. But that interest does not warrant the complained-of burden on voters because Defendants have not demonstrated that permitting voters who were belatedly notified of signature mismatch to cure their ballots would inordinately disrupt the smooth facilitation of the election.
As the district court noted, only about 4,000 ballots were rejected for signature mismatch at the time of its order-less than 5 hundredths of a percent of the more than 9 million total ballots cast in Florida for the 2016 general election. Democratic Exec. Comm. , 347 F.Supp.3d at 1032 ; Fla. Dep't of State, Div. of Elections, Voting Activity by Ballot Type for 2016 General Election (last updated Mar. 24, 2017), https://dos.myflorida.com/media/697842/2016-ge-summaries-ballots-by-type-activity.pdf. Of those 4,000 ballots, not all were cast by eligible voters. And even for those that were, only a portion of the eligible voters casting those votes were belatedly notified. Even the NRSC has described this subset of injured voters as "tiny." So it is difficult to see how-and Defendants have not shown how-a state equipped to deal with more than 9 million voters would be unduly burdened by providing the fraction of a percent of injured voters an opportunity to cure signature mismatch and have their rightful ballots counted in accordance with the district court's preliminary injunction.
Nor, as Defendants suggested in the district court, does Lemons v. Bradbury , 538 F.3d 1098 (9th Cir. 2008), support a different conclusion. In Lemons , the Ninth Circuit worried about the administrative *1323 difficulties associated with suddenly requiring state officials to provide notice and a chance to cure to thousands of petition signers when no such requirement previously existed. See id. at 1104-05. But here, Florida already had a cure mechanism for those with mismatched signatures. See Fla. Stat. § 101.68(4)(a).
And contrary to Defendants' assertions, it is not too difficult to interpret and apply the district court's order. Mindful that time was of the essence as the counting of votes was already underway, the district court allowed for two days from the time of its order for certain injured voters to cure their ballots, demonstrating that a reasonable cure period provides 48 hours' notice of the defect before a voter's opportunity to cure expires. Democratic Exec. Comm. , 347 F.Supp.3d 1017, 1022 n.1, 1032. Thus, anyone who received notice later than would allow them 48 hours to cure was belatedly notified. And consistent with our long practice of relying on the threat of penalty of perjury to guard against dishonesty and fraud, see United States v. Yates , 438 F.3d 1307, 1318 (11th Cir. 2006), the district court's order allows a voter to attest that she was belatedly notified by declaring under penalty of perjury that she did not timely receive actual notice of signature mismatch.[13]
Finally, we consider Florida's interest in fundamental fairness and protecting public confidence in the legitimacy of the election. Once again, we fully agree that Florida enjoys legitimate and strong interests in these things. But in this case, these considerations actually swing decisively in favor of the DECF and the Nelson Campaign.
On fundamental fairness, Defendants and the Dissent complain that the district court has unfairly upset settled expectations by changing the rules mid-contest. Dissent at 1341, 1345. We are not convinced.
First, we note that the record here reflects that, in violation of the language of the governing provisions, one county counted previously rejected ballots for which it received cures after the deadline, since the Post Office had mistakenly held onto cure submissions beyond the deadline. We certainly do not criticize that county for trying to ensure the affected voters were not disenfranchised through no fault of their own. And to the extent that that county's actions can be viewed as a technical "wrong" under Florida's election code, we do not ascribe to the idea that two wrongs make a right.
But the fact remains that Florida already applied changed rules mid-election to count vote-by-mail votes that did not satisfy Florida's written rules. So if a general expectation existed at some point that the rules would be enforced so as not to count even the votes of vote-by-mail voters whose ballots had been rejected through no fault of their own, as a matter of fact, Florida's own actions decimated that anticipation and effectively created a new expectation: that opportunity would be created for the counting of legitimately cast ballots that were not counted through no fault of the voter.
Second, to the extent that an unsettled expectation and unfairness may have existed at the time the district court considered Plaintiffs' motion for preliminary injunction, *1324 it befell Plaintiffs. A realistic assessment of the facts here indicates that vote-by-mail voters who followed the ostensible deadline for their ballots only to discover that their votes would not be counted and that they would have no recourse were the ones to experience a clash with their expectations and fundamental fairness. See Bullock v. Carter , 405 U.S. 134, 143, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972) (explaining that "the rights of voters and the rights of candidates do not lend themselves to neat separation" and that "[i]n approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters").
To understand why, we briefly visit the recent history of the cure provision in Florida. In 2016, as we have noted, the same district court that issued the preliminary injunction under review here examined Florida's signature-match scheme and tried to address the problem afflicting the subset of voters whose signatures were found not to have matched those on file but who were provided no opportunity to remedy that problem. Under the 2016 scheme, a vote-by-mail voter had no opportunity to cure under the code if her ballot was rejected for signature mismatch. Fla. Democratic Party , 2016 WL 6090943, at *1. The district court explained then that the scheme existing at that time "categorically disenfranchised thousands of voters arguably for no reason other than they have poor handwriting or their handwriting has changed over time." Id. at *7. These otherwise eligible voters, the district court said, were "robbed of one of our most basic and cherished liberties; namely, the right to vote and have that vote counted." Id. at *8. To remedy the constitutional infirmity of the previous signature-match scheme, the district court ordered that those with mismatched-signature ballots be given a chance to cure. Id. at *9. Shortly after the district court issued its order, Florida amended its election code to add a cure provision.
Against this backdrop, a fair expectation going into the 2018 election was that vote-by-mail voters would no longer be subjected to a situation where they would be deprived of their right to vote by not having an opportunity to cure legitimately cast ballots rejected for signature mismatch. But the code's remedy to make that expectation a reality turned out, in practice, to be illusory in some instances.
As we have noted, Florida's stated deadline for ensuring that the Secretary received vote-by-mail ballots was later than the deadline to cure. And more significantly, canvassing boards were not required to start canvassing vote-by-mail ballots until a day after the election-two days after the cure deadline. To make sure her ballot was counted, then, a voter had to know that the published 7 p.m. receipt deadline did not tell the whole story. She had to anticipate that her ballot would be rejected for signature mismatch and take affirmative steps like submitting a ballot well in advance of the published deadline-which still would not guarantee that she would be notified of any signature mismatch until it was too late to do anything to remedy the problem. Not only is this unrealistic and unreasonable, but as the voters' declarations in this case show, it renders the opportunity to cure illusory in some circumstances. In so doing, it defeats the purpose of requiring Florida to add a cure provision as expressed in the district court's 2016 order.
For these reasons, we respectfully reject Defendants' and the Dissent's arguments that the preliminary injunction effected an unfair change to the "rules" and that voters whose votes were not counted for signature mismatch necessarily have only themselves to blame. Dissent at 1341, 1344. It is one thing to fault a voter if she fails to *1325 follow instructions about how to execute an affidavit to make her vote count, see Roe v. Alabama , 43 F.3d 574, 580-81 (11th Cir. 1995), or if she inexcusably fails to enroll in a political party by a stated deadline, Rosario v. Rockefeller , 410 U.S. 752, 757-58, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973). But it is quite another to blame a voter when she may have done nothing wrong and instead may have simply had the bad luck to have had her ballot reviewed by a particularly strict (and not formally trained) judge of signatures, and then to not have been notified of the problem until it was too late to do anything about it.
For these same reasons, we disagree with the Dissent that the district court improperly (1) enfranchised those who did not follow the rules, (2) disenfranchised those who would have voted or cured if not for the rules, and (3) diluted the votes of those who properly voted according to the rules. Dissent at 1345-46.
First, to the extent the district court enfranchised people, it was those vote-by-mail voters who reasonably expected to be afforded a cure if their ballots were rejected for mismatched signature. Second, even assuming people exist who would have voted but did not because of the defective cure provision, that number is nominal at best. Even Bad Luck Schleprock[14] would not have been likely to anticipate that his ballot might be rejected for signature mismatch and that he might not be notified about this problem in time to do anything to correct it, and then decide that for this reason, he would not submit a ballot in the first place. Finally-even setting aside the fact that Florida already acted on its own to count votes that did not strictly comply with the rules-the existing counted votes were artificially over-weighted because the previous vote pool excluded the votes of those who followed the vote-by-mail rules yet whose votes were excluded through no fault of their own. So allowing these voters an opportunity to have their votes counted did not impermissibly dilute the votes of those who followed the rules.
Defendants and the Dissent fret that allowing this small group of affected voters an opportunity to demonstrate their eligibility to vote undermines the public's faith in elections. Dissent at 1346. But we respectfully disagree. In our view, doubling down on the disenfranchisement of vote-by-mail voters who complied with Florida's published deadline is not the way to promote faith in elections.
c. The Weighing of the Burden on the Right to Vote Against the State's Justifications
Finally, we come to the point in the Anderson - Burdick analysis where we weigh the serious burden Florida's signature-match scheme imposes on vote-by-mail voters who have belatedly been notified of a signature mismatch, against Florida's interests in perpetuating this scheme. We conclude on this record that the serious burden on voters outweighs Florida's identified interests: the state's interest in preventing fraud is not in conflict with the voters' interest in having their legitimately-cast ballots counted; the state has not shown that its interest in facilitating timely and orderly election processing will be impaired by providing the injured voters with *1326 a reasonable opportunity to have their votes counted; and public faith in elections benefits from providing injured voters the opportunity to have their legitimately cast ballots counted when the reason they were not counted was not the voters' fault.
For these reasons, the NRSC has failed to make a strong showing that it is likely to succeed on the merits of the constitutional issue.
ii. The NRSC has not made a strong showing that it is likely to succeed on the merits of its laches argument.
The NRSC also argues that the equitable doctrine of laches bars the district court's preliminary injunction. In response, Plaintiffs urge that laches does not apply when the plaintiff seeks only to stop continuing constitutional violations. We need not consider whether laches applies to bar prospective relief from constitutional harms, because the NRSC cannot satisfy the laches elements.
To succeed on a laches claim, the NRSC must demonstrate that Plaintiffs inexcusably delayed bringing their claim and that the delay caused it undue prejudice. United States v. Barfield , 396 F.3d 1144, 1150 (2005). This they cannot do.
At the time Plaintiffs brought this action, only about a year had passed since the Florida legislature amended the signature-match scheme by adding the defective cure provision, see Fla. Stat. § 101.68 (effective June 2, 2017), and the DECF had just litigated the topic of signature mismatches, see Fla. Democratic Party , 2016 WL 6090943, at *1. As the district court aptly noted, the DECF did not need to relentlessly "search and destroy every conceivable potential unconstitutional deprivation," Democratic Exec. Comm. , 347 F.Supp.3d at 1031, but could catch its breath, take stock of its resources, and study the result of its efforts. In fact, between Florida's adoption of the challenged provisions and the November 2018 election, the only other major statewide election to occur was the 2018 primary election, which wrapped up just weeks before the November 2018 election. So as a matter of fact, we cannot find inexcusable delay.
Nor can the NRSC show undue prejudice arising from any delay, since the NRSC has not established that any of the harms it anticipates are anything more than minimal or nonexistent. As we have mentioned, the state's administrative burden was nominal; its interest in preventing fraud was unaffected; and public faith in the election is better-served by allowing Plaintiffs' suit.
On this record, the NRSC cannot make a strong showing that it is likely to succeed on the merits of its laches argument.
B. The remaining Nken factors similarly disfavor a stay.
The remaining Nken factors do not persuade us to exercise our discretion to stay the district court's injunction.
We begin with irreparable injury. The NRSC claims that it will suffer irreparable injury because the district court's order will trigger a chaotic restart of the election, cause the NRSC to expend unrecoverable resources on a get-out-the-cure campaign, and create the "substantial risk" of counting late-cured ballots. We disagree.
First, the NRSC's concern about a chaotic restart of the election is significantly overstated, as we have explained in our discussion about the manageability of the district court's order. Second, the threat of penalty of perjury safeguards against false claims of belated notification. Plus, the NRSC's assertion about the risk of undiscoverable fraud is entirely unsubstantiated.
*1327 This leaves the NRSC's contention that the injunction forces it to expend unrecoverable resources to encourage voters to cure their ballots. But even assuming this to be true, that injury is not enough to overcome the NRSC's inability to show likelihood of success on the merits. See Virginian Ry. Co. v. United States , 272 U.S. 658, 672, 47 S.Ct. 222, 71 L.Ed. 463 (1926) ("A stay is not a matter of right, even if irreparable injury might otherwise result to the appellant.").
As for the public interest and any harm caused by a stay, Defendants similarly have failed to show that these factors tilt in their favor. A stay would disenfranchise many eligible electors whose ballots were rejected by a flawed signature-match scheme. And public knowledge that legitimate votes were not counted due to no fault of the voters-and with no reasonable notice to the voters that their votes would not be counted and no opportunity to correct that situation-would be harmful to the public's perception of the election's legitimacy. Yet protecting public confidence in elections is deeply important-indeed, critical-to democracy. See Crawford v. Marion Cty. Election Bd. , 553 U.S. 181, 197, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008) (plurality). And the public interest is served when constitutional rights are protected. Melendres v. Arpaio , 695 F.3d 990, 1002 (9th Cir. 2012). So the third and fourth Nken factors do not favor granting the stay.
In short, the NRSC has failed to make the requisite showing to justify a stay of the district court's preliminary injunction under the Nken factors.
IV. Response to the Dissent
Finally, we address the Dissent's remaining arguments. These arguments arise from the Dissent's mistaken notions that the district court improperly reframed the issue in the case, producing an injunction that was flawed. We respectfully disagree with the Dissent's reasoning. To explain why, we begin by reviewing the district court's charge when addressing a motion for preliminary injunction, as well as the relief the district court ultimately ordered. We then respond to the Dissent's other arguments based on its mistaken notion.
A. The district court was empowered to enter the narrow and reasonable preliminary injunction it did.
"Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." Trump v. Int'l Refugee Assistance Project , --- U.S. ----, 137 S.Ct. 2080, 2087, 198 L.Ed.2d 643 (2017). In considering whether to grant an injunction, a court evaluates the applicant's likelihood of success on the merits, whether the applicant will suffer irreparable harm without the injunction, the balance of equities, and the public interest. Winter v. Natural Resources Defense Council , 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008).
If the court decides to grant an injunction, it must also ascertain what relief to provide, keeping in mind that the purpose of the injunction is not to conclusively determine the rights of parties, but only to balance the equities in the interim as the litigation proceeds. Trump , 137 S.Ct. at 2087. In executing its duties, the court must pay particular attention to the public consequences of any preliminary relief it orders. See Winter , 555 U.S. at 24, 129 S.Ct. 365. So it is axiomatic that a district court "need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case." Trump , 137 S.Ct. at 2087 (quoting *1328 11A Charles Alan Wright, et. al., Federal Practice and Procedure § 2947 (3d ed.) ).
Here, the district court did just that. The preliminary injunction was quite limited. Plaintiffs requested the district court categorically enjoin the enforcement of the signature-match scheme as to all vote-by-mail and provisional ballots, meaning they asked the court to require all vote-by-mail and provisional ballots that had been rejected for signature mismatch to be counted.
But the district court did "not grant the total relief sought." See id. Rather, it "mold[ed] its decree to meet the exigencies of the particular case." Id. Instead of directing every mismatched ballot to be counted, the district court ordered only the ballots of those voters who had been belatedly notified of the mismatch to be counted-and only after those voters cured their ballots within a short window of time. That was well within its discretion. Indeed, nothing requires a district court to award all or nothing when it comes to a preliminary injunction. See id.
And in this case, the district court's targeted injunction made sense. The subset of voters who received timely notice of the signature mismatch were already afforded the cure provision that the district court had ordered in 2016. So they at least had an opportunity to cure a ballot flagged for signature mismatch. But the same could not be said of those voters who were not timely notified. They faced the same risk of disenfranchisement that the district court identified as unconstitutional two years earlier. The district court carved away much of the relief Plaintiffs preliminarily requested to award just the portion of the relief Plaintiffs sought that it previously found to be constitutionally demanded: an opportunity to cure.
Striking down the signature-match scheme wholesale may have been a possibility between elections if enough time existed for the legislature to enact a replacement or prohibit vote-by-mail and provisional voting. But given the timing, taking that course would have awarded too much relief because it might have allowed some fraudulent ballots to be counted. On the other hand, doing nothing would have given too little relief because it risked disenfranchising voters. So the district court's Goldilocks solution was just right to address the apparent hole in the signature-match process-that is, the lack of a reasonable opportunity to cure a signature mismatch. And the awarded relief was a subset of the relief Plaintiffs sought. That was within the district court's discretion under the circumstances.
B. The district court did not deny Defendants an opportunity to be heard on the relief it ultimately granted.
The Dissent asserts that the district court reframed the question presented by Plaintiffs from whether the signature-match scheme can withstand constitutional scrutiny to whether the signature-match scheme and an adequate cure provision can withstand constitutional scrutiny. Dissent at 1336-37, 1345. In the Dissent's view, the district court deprived Defendants of due process by denying them an opportunity to respond to the allegedly reframed question. Id. at 1345.
Again, we must respectfully disagree.
First, the district court's grant of partial relief neither reframed the issue nor denied Defendants an opportunity to discuss the cure procedure. The Dissent reaches the contrary conclusion because it equates partial relief with reframing the question. But as we have explained, that is not the case. See supra at 1327-28 (quoting Trump , 137 S.Ct. at 2087 ) (citation and quotation marks omitted) (a district court "need not grant the total relief sought by *1329 the applicant but may mold its decree to meet the exigencies of the particular case").
Here, Plaintiffs asked the court to require every vote that was rejected for signature-mismatch to be counted. That would have entailed throwing out all signature-mismatch provisions as an unconstitutional burden on their right to vote. So naturally, the district court had to examine the entire signature-mismatch process-including Fla. Stat. § 101.68(4), the cure procedure, which Plaintiffs expressly identified in their complaint-to evaluate Plaintiffs' claim that the signature-match scheme unconstitutionally disenfranchised vote-by-mail voters whose signatures had been mismatched.
The preliminary injunction the court eventually entered granted only a portion of Plaintiffs' requested relief, preserving as much of the statutory scheme as possible, given the court's previous ruling that the signature-match provisions without an acceptable cure process unconstitutionally burdened the right to vote. See Fla. Democratic Party , 2016 WL 6090943, at *1. Granting only part of the relief sought is not reframing the question.
Plus, every party pointed the district court to the cure provision in their filings. In their complaint, Plaintiffs first noted that the cure deadline precedes the deadline for receipt of vote-by-mail ballots before alleging that "scores of voters are disenfranchised based on the timing of the mail." Plaintiffs reiterated this point in their memorandum in support of their preliminary injunction request, again arguing that "scores of voters who are unable to meet [the cure] deadline will be denied the right to vote." And all three Defendants independently directed the court's attention to the cure provision in their filings, in an effort to show that the signature-match scheme contained adequate procedural protections. Thus, both sides raised the cure provision, and the district court's consideration of whether the signature-match scheme and an adequate cure provision can withstand constitutional scrutiny was entirely appropriate.
Beyond that, the record reflects that the topic of cure came up repeatedly during the preliminary injunction hearing. Witnesses were specifically questioned about the cure period and notice. See , e.g. , Transcript of Nov. 14, 2018, Hearing at 23, Democratic Exec. Comm. of Fla. v. Detzner , 347 F.Supp.3d 1017 (No. 4:18-CV-520-MW/MJF) ("So all of the ballots received between 5:30 p.m. on the date before election day and 7 p.m. on election day, those ballots cannot be cured if there's a signature mismatch issue; is that right?" "But if you don't receive [the cure documentation] before 5:30 p.m. the day before election day, then [the signature mismatch] can't be cured; right?"), 24 ("[D]o you have any idea how many cure affidavits you got after that 5:30 deadline?"), 30 ("[I]f an individual wants to make the argument ... that a mismatched signature is actually a signature match, ... they cannot make that argument [after 5 p.m. the day before the election and between noon on Saturday, even though a person may challenge the legality of a vote-by-mail ballot under Section 101.168 during that period]; right?"), 70 ("[W]hat is your understanding of the process to challenge a ballot by either an elector, a voter, or a candidate as it relates to challenging something because there is not a matching signature?"). And Defendants did not object.
Not only that, but the court itself asked Plaintiffs' counsel, "Why would I not order-if [Plaintiffs] were to win, why wouldn't I order some process where there would be an opportunity to, for example, challenge the rejection of the votes as opposed to just outright counting them?" Transcript of Nov. 14, 2018, Hearing at 97-98.
*1330 And Plaintiffs' counsel responded, "[I]f this Court wanted to grant these voters an opportunity to cure their vote-by-mail ballots, signature mismatches, ... there's a way to do that ...." Id. at 100. Plaintiffs' counsel then went on to suggest "eliminat[ing] all instances when a ballot can be tossed for a signature mismatch and the voter be given zero opportunity to cure that signature mismatch." Id. at 106. The court responded that Oregon's "14-day period after the election to fix ... signatures" provides "a real opportunity to fix it." Id. at 107.
And when the district court asked what alternative relief Plaintiffs sought, Plaintiffs expressly asked the court to fashion a more modest injunction granting only partial relief-specifically, "for all of these voters whose ballots have been rejected for signature mismatch, the alternative relief would be to grant these voters a chance to cure and extend these deadlines to give these voters a chance to have their ballots counted." Id . at 111. Plaintiffs' counsel also argued that the signature-mismatch scheme "impose[s] an undue burden ... to the extent that it deprives individuals [of] the right to vote, and it does so by depriving them [of] the right to cure their ballot." Id. at 200.
As for Defendants, the court asked them, "Why would the world come to an end if, in the next couple of days before the 18th, if I entered an order today that said ... that if somebody wants to challenge the rejection of their ballot, they can do so between now and the evening of the 17th." Id. at 127-28. It further inquired, "Why does a Florida Statute, that does not give an opportunity to challenge the decision of the canvassing board comport with due process?" Id. at 167.
Clearly, the cure issue was before the district court, and Defendants had an opportunity to be heard on it.
C. To determine that Plaintiffs enjoyed a likelihood of success on the merits, the district court was not required to grant the entire preliminary injunction Plaintiffs originally requested nor ameliorate the right to vote for every voter whose vote was not counted because of signature mismatch.
Next, we turn to the Dissent's suggestion that the district court was required to find that likelihood of success on the merits turned on whether granting the requested injunction in total was appropriate. That mistaken notion elides the difference between the merits and the remedy and incorrectly suggests that the district court's discretion is limited to an all-or-nothing choice when it comes to ordering injunctive relief. We have already explained why that is not correct. See supra at 1328.
In a somewhat related vein, the Dissent also contends that the district court's order offered no real relief to voters subjected to a flawed signature-match scheme because disenfranchisement is irreparable. Dissent at 1340 ("Approximately 5,000 [vote-by-mail] and provisional voters had been disenfranchised ... by the operation of the Code's standardless signature-matching provisions, but they received no relief. The Court gave them no relief because the disenfranchisement could not be undone.") (quotation marks omitted). We respectfully disagree with the notion that the district court offered no relief.
As the Dissent itself notes, rejection for signature mismatch does not necessarily mean disenfranchisement. See Dissent at 1344 (explaining how a voter could cure a ballot rejected for mismatched signature). Some voters, by happenstance, will have had a meaningful opportunity to cure because they received timely notice of a mismatched signature. And as for the voters *1331 who belatedly received notice of signature mismatch, their disenfranchisement was not assured unless the district court declined to award relief. But here, the district court entered its preliminary injunction providing them with the same opportunity to cure that other vote-by-mail voters had had. Those who took advantage of the district court's relief had their ballots counted and were able to avert disenfranchisement.
D. The district court's preliminary injunction did not violate principles of federalism.
The Dissent's last attack on the district court's preliminary injunction alleges that the court offended principles of federalism by rewriting Florida's election laws. Dissent at 1347-48. According to the Dissent, if Florida's law were truly unconstitutional, principles of federalism dictate that the district court's only recourse was to strike the signature-match scheme down in its entirety. Id. at 1347-48 & n.42. We do not share the Dissent's view for three reasons.
First, the district court was not adjudicating final judgment. For the emergency preliminary injunction motion before it, the district court's duty was "not to conclusively determine the rights of parties, but only to balance the equities in the interim as the litigation proceeds." Trump , 137 S.Ct. at 2087. That's exactly what the court did.
Second, while federalism certainly respects states' rights, it also demands the supremacy of federal law when state law offends federally protected rights. See Puerto Rico v. Branstad , 483 U.S. 219, 228, 107 S.Ct. 2802, 97 L.Ed.2d 187 (1987) (rejecting the premise that states and the federal government should always be viewed as coequal sovereigns and explaining that "[i]t has long been a settled principle that federal courts may enjoin unconstitutional action by state officials."); Reynolds v. Sims , 377 U.S. 533, 584, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) ("When there is an unavoidable conflict between the Federal and a State Constitution, the Supremacy Clause of course controls."). Indeed, Ex parte Young , 209 U.S. 123, 28 S.Ct. 441, which authorizes suit against the Secretary in her official capacity in this case, was designed to "give[ ] life to the Supremacy Clause." Green v. Mansour , 474 U.S. 64, 68, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985). So to the extent the district court concluded that any aspect of the signature-match scheme unconstitutionally burdened vote-by-mail voters' fundamental right to vote, it had a duty to strike down the offending part.
And third, rather than undermining Florida's sovereignty, the preliminary injunction's solution actually respected it. For purposes of the preliminary injunction, instead of throwing out the plausibly legal with the constitutionally problematic, the district court narrowly tailored its relief to home in on the one limited aspect of Florida's signature-match scheme it already found unduly burdened vote-by-mail voters' right to vote. And it preserved application of the rest of the scheme in the interim.
V. Conclusion
For these reasons, we deny the NRSC's motion to stay the district court's preliminary injunction.

As we have noted, Laurel M. Lee was substituted as a defendant in this case when she recently became Florida's Secretary of State. Florida's prior secretary of state was a man. For ease of reference and clarity and since Florida's current Secretary of State is a woman, we use the feminine gender throughout this opinion to refer to Florida's Secretary of State, regardless of whether a man or a woman held the position at the time of any specific event discussed in this opinion.

Since the NRSC filed its appeal as an emergency motion for stay, we previously issued our order denying that motion over one dissent. We indicated in that order that written opinions explaining the basis for our decision would follow. This opinion sets forth our reasoning.

The facts provided come from the record evidence unless otherwise indicated.

Before the district court, the Attorney General posited that Fla. Stat. § 101.048(1) empowers a provisional voter to cure her mismatched signature by 5 p.m. on the second day following the election. However, § 101.048(1) merely allows a provisional voter to present written evidence supporting her eligibility to vote. That evidence is then considered by the county canvassing board when determining whether the person is entitled to vote. Id. § 101.048(2)(a). Only after determining that the person is entitled to vote does the canvassing board compare signatures. Id. § 101.048(2)(b). The section provides no information about giving notice of signature mismatch in time to implement a cure, let alone information on how to cure. On its face, § 101.048(1) cannot fairly be said to provide provisional voters an opportunity to cure.

The preliminary-injunction factors a district court considers include the following: (1) the likelihood of success on the merits, (2) whether irreparable injury will occur in the absence of the preliminary injunction, (3) the balance of burdens on the parties, and (4) the public interest. See Siegel v. LePore , 234 F.3d 1163, 1176 (11th Cir. 2000).

In the district court, Plaintiffs also alleged that the scheme violates the Fourteenth Amendment's Equal Protection Clause, but the district court did not enter relief on this theory, and Plaintiffs did not cross-appeal on that basis. Therefore, we do not explore this particular theory of Plaintiffs'.

Swanson discussed these rights in relation to a candidate, but "the rights of voters and the rights of candidates do not lend themselves to neat separation." Bullock v. Carter , 405 U.S. 134, 143, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972).

Under Anderson - Burdick , it is not necessary for a plaintiff to show discriminatory intent to make out a claim that the state has unconstitutionally burdened the right to vote. To be sure, a traditional Equal Protection Clause claim is cognizable in the voting context if the plaintiff alleges that discriminatory animus motivated the legislature to enact a voting law. Vill. of Arlington Heights v. Metro. Hous. Dev. Corp. , 429 U.S. 252, 265, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."). And Plaintiffs' complaint contained allegations that could be construed as a traditional Equal Protection Clause challenge. But that is not what the district court focused on in granting the preliminary injunction under review. So that issue is not before us.

The Dissent takes issue with this legal conclusion and instead asserts that Florida law requires the county supervisor of election to (1) immediately "compare the signature on the voter's certificate with the signature on the voter's registration entry," and (2) "immediately notify the voter" if the supervisor finds the signatures do not match. Dissent at 1342. But the Dissent's interpretation of the governing statute is not consistent with either what that statute actually requires or what, in practice, occurs in Florida. To reach its mistaken conclusion, the Dissent relies on § 101.68(1) and (4)(a). Dissent at 1342 & n.32. In relevant part, § 101.68(1) provides, "The supervisor ... shall receive the voted ballot, at which time the supervisor shall compare the signature of the elector on the voter's certificate with the signature of the elector in the registration books or the precinct register to determine whether the elector is duly registered in the county and may record on the elector's registration certificate that the elector has voted .... Except as provided in subsection (4), after a vote-by-mail ballot is received by the supervisor, the ballot is deemed to have been cast ...." (emphasis added). By its language, this provision requires the supervisor to compare signatures and record all votes the supervisor deems to be legitimately cast. As for votes the supervisor cannot certify as validly cast, the provision directs us to § 101.68(4). That provision states, "The supervisor shall, on behalf of the county canvassing board , immediately notify an elector who has returned a vote-by-mail ballot ... that does not match the elector's signature in the registration books or precinct register." Id. (emphasis added). By its terms, this provision requires the supervisor to notify voters whose signatures do not match-but only on behalf of the county canvassing board, not on the supervisor's own. A third provision not cited by the Dissent also comes into play: § 101.68(2)(c) 1. That provision directs, "The canvassing board must, if the supervisor has not already done so, compare the signature of the elector on the voter's certificate or on the vote-by-mail ballot cure affidavit as provided in subsection (4) with the signature of the elector in the registration books or the precinct register ... to determine the legality of that vote-by-mail ballot." This provision tasks the canvassing board with performing the signature-match function for ballots the supervisor, in exercising her authority under § 101.68(1), cannot deem valid ballots. And that is why § 101.68(4) requires the supervisor, on behalf of the canvassing board , to notify voters whose ballots have been rejected for signature mismatch. Indeed, evidence admitted during the hearing in this case bears this out. Leon County's supervisor of elections testified that while members of his staff immediately make an initial comparison of signatures and approve some ballots, any ballot with a signature that the staff cannot validate is referred to the canvassing board for review-so it is the canvassing board that rejects the ballots. Of course, nothing stops a county from going above and beyond and notifying voters of potential mismatch as soon as the supervisor's staff flags a ballot for the canvassing board's review. But the relevant code provision requires only that the supervisor notify voters when an actual mismatch is found, and the evidence shows that only the canvassing board may make that determination.

We need not and do not determine whether the burden imposed is anything more than serious, since on this record, as we explain, the state's interests do not sufficiently justify the burden imposed.

The availability of an effective cure process should incidentally also have the salutary effect of relieving the burden inflicted on voters by the unevenness of signature-match standards and training from county to county.

The Dissent faults the district court for not fashioning a more perfect preliminary injunction. Dissent at 1346-47. But given the circumstances and the district court's broad discretion in shaping an injunction, and as we discuss infra at 1327-28, the district court's order falls within the realm of reasonableness. Trump v. Int'l Refugee Assistance Project , --- U.S. ----, 137 S.Ct. 2080, 2087, 198 L.Ed.2d 643 (2017) (discussing district courts' wide discretion in molding a preliminary injunction).

Bad Luck Schleprock was a character in the 1970s Hanna-Barbera television series The Pebbles and Bamm-Bamm Show and The Flintstone Comedy Hour . See The Pebbles and Bamm-Bamm Show , IMDB, https://www.imdb.com/title/tt0066699/?ref_=nv_sr_1 (last visited Feb. 15, 2019); The Flintstone Comedy Hour , IMDB, https://www.imdb.com/title/tt0068073/ (last visited Feb. 15, 2019). He perpetually had a rain cloud over his head and always experienced misfortune. See , e.g. , Schleprock's New Image , IMDB, https://www.imdb.com/title/tt1904367/ (last visited Feb. 15, 2019).