[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 20-11401-B
_____

YASHICA ROBINSON,
M.D., on behalf of themselves, their patients,
physicians, clinic administrators, and staff,
ALABAMA WOMEN'S CENTER,
on behalf of themselves, their patients, physicians,
clinic administrators, and staff,
REPRODUCTIVE HEALTH SERVICES,
on behalf of themselves, their patients, physicians,
clinic administrators, and staff,
WEST ALABAMA WOMEN'S CENTER,
on behalf of themselves, their patients, physicians,
clinic administrators, and staff,

Plaintiffs - Appellees,

PLANNED PARENTHOOD SOUTHEAST INC.,
on behalf of themselves, their patients, physicians,
clinic administrators, and staff,

Plaintiff,

versus

ATTORNEY GENERAL, STATE OF ALABAMA,
SCOTT HARRIS,
M.D., in his official capacity as the State Health
Officer at the Alabama State Department of
Public Health,

Defendants - Appellants,

ROBERT L. BROUSSARD,
in his official capacity as District Attorney
for Madison County, et al.,

Defendants.

_____

On Appeal from the United States
District Court for the Middle District of Alabama

_____

BEFORE MARTIN, JORDAN, and ROSENBAUM, Circuit Judges.

JORDAN, Circuit Judge.

The Alabama Attorney General, Steve Marshall, and the Alabama State Health Officer, Dr. Scott Harris, move for a stay of a preliminary injunction that enjoins certain applications of a public health order issued in response to the COVID-19 pandemic in Alabama.   For the reasons which follow, we deny the motion for a stay, and in a separate order we expedite the appeal.

**I**

On March 13, 2020, the Governor of Alabama declared a state public health emergency due to the outbreak of the novel coronavirus known as COVID-19.   Dr. Harris subsequently issued a series of orders to combat the spread of the virus.   One of these orders, published on March 27, 2020, mandated the postponement of "all dental, medical, or surgical procedures," with two exceptions: (a) those "necessary to treat an emergency medical condition;" and (b) those "necessary to avoid serious harm from an underlying condition or disease, or necessary as a part of a patient's ongoing and active treatment."   Initially, the order was to remain in effect until April 17, 2020, but on April 3, 2020, Dr. Harris issued an amended order which is substantively identical to the March 27 order but applies until April 30, 2020. Both orders provide that they may be extended or relaxed depending on the circumstances.   A violation of the March 27 or April 3 orders constitutes a misdemeanor.   *See* Ala. Code § 22-2-14.

The plaintiffs—Dr. Yashica Robinson, the Alabama Women's Center, Reproductive

2

Health Services, and the West Alabama Women's Center—are abortion providers in Alabama. After Dr. Harris issued the March 27 order, counsel for the plaintiffs reached out to the Alabama Department of Public Health to determine whether the order would be applied to their clinics.   On March 29, the chief counsel to the Attorney General stated in response: "[W]e are unable to provide . . . a blanket affirmation that abortions will, in every case, fall within one of the exemptions."   D.E. 73 at 48 ¶¶ 14, 71 (attachment 7).   Because they were concerned about being prosecuted for exercising their medical judgment, on March 30 the plaintiffs sought a temporary restraining order preventing enforcement of the March 27 order as applied to pre-viability abortions.[1]

The district court held a hearing on the motion for a TRO that same day.   At the hearing, counsel for the state said that the March 27 order applies to abortions, and that abortion procedures do not fall into the enumerated exceptions unless they are required to protect the life or health of the mother.   *See* D.E. 98 at 20–21.   Based on these representations, the district court issued a TRO.   *See* D.E. 83.

Two days later, on April 1, the state filed a motion to dissolve the TRO in which it clarified that during the TRO hearing it "did not mean to suggest" that protecting the life or health of the mother "are the only circumstances where an abortion would fit within one of the two exceptions." D.E. 89 at 26, n.30.   In response, the district court held another hearing on April 3 to discuss the state's revised interpretation of the March 27 order.   During this hearing, the district court understood the state to be making several clarifications as to the scope of the March 27 order and its exceptions.   *See* D.E. 137 at 10–12.   These clarifications indicated, in pertinent part, that an abortion could go forward if:

---

[1] This issue arose in the course of ongoing litigation between the parties regarding a different Alabama statute.   *See* D.E. 1.   The plaintiffs amended their complaint and moved for a TRO on March 30, three days after the March 27 order was issued.

3

- as with all other medical procedures, a doctor determines that one of the exceptions in the order applies;

- a healthcare provider determines that a patient will lose her right to lawfully seek an abortion in Alabama based on the order's mandatory delays, given that under Alabama law, abortion becomes illegal when the probable postfertilization age of the fetus is at least 20 weeks, *see* Ala. Code § 26-23B-5; or

- a healthcare provider determines that an abortion may not be delayed "in a healthy way."

*See* D.E. 111 at 10–13.   The district court adopted these clarifications in an order staying the TRO in part.   *See id.*   It did so to make the state's clarifications binding.   *See* D.E. 137 at 13.

As noted above, on April 3 Dr. Harris issued an amended order which is substantively identical to the March 27 order but applies through April 30.   On April 5, the state submitted additional clarifications as to how it interpreted the April 3 order.   The state clarified that:

- "a healthcare provider's assertion that a procedure meets one of the exceptions [in the order] is not *conclusive proof* that the procedure meets one of the exceptions";

- although "[t]he fact that a delay would render a procedure unavailable could be relevant to determining whether it is currently necessary to perform the procedure[,] . . . any healthcare provider would still need to make an individualized determination for his or her patient as to whether losing the ability to have a procedure performed would cause *serious harm* to the patient"; and

- while a procedure may be performed if it cannot be delayed in a "healthy way," the risk to a patient's health must be "*sufficiently 'serious.'*"

*See* D.E. 120 at 2–3 (emphasis added).

The next day, however, during the hearing on the plaintiffs' motion for a preliminary injunction, Dr. Harris changed the state's interpretation again.   He testified that healthcare providers would be "the ones who determine whether their procedure fits into th[e] exceptions [in the order], not the health department," based on their "clinical judgment."   D.E. 133 at 49.   He further explained that providers may "consider whatever factors they would deem would be appropriate to make that determination."   *Id*. at 16.

4

Dr. Robinson testified that the state's April 5 clarifications "made it very clear to [her] that [her] medical judgment was not the final decision when it came to the care decisions that [she] was making for [her] patients." *Id.* at 125. She said that she does not "know who that is going to be left up to, but it made it very clear to [her] . . . that [her judgment] would not be the final call." *Id.* She has "significant concerns about whether [her] medical judgment will be treated with the same respect as other physicians" due to the history of hostility towards her as an abortion provider in Alabama. *See id.* at 116–117. For instance, during the COVID-19 crisis, protesters had already called the police on her facility, trying to shut it down. *See id.* at 121. She is concerned that, if she violates the April 3 order, she will be subject to misdemeanor charges. *See id.* at 166.

Although the district court did not determine that the April 3 order—as interpreted by Dr. Harris at the preliminary injunction hearing—was unconstitutional, it explained that the plaintiffs "cannot rely on the defendants' non-binding assurances that they will not return to" their earlier interpretation of the order: that abortions may proceed without delay only if they are necessary to protect the mother's life or health. *See* D.E. 137 at 20–21. Based on the evidence presented at the preliminary injunction hearing, the district court determined that the medical restrictions, as read pursuant to the state's earlier interpretation, violate the Fourteenth Amendment. *See id.* at 20. Accordingly, it concluded that the plaintiffs demonstrated a substantial likelihood of success on the merits and granted a preliminary injunction. *See id.* at 21.

The preliminary injunction issued by the district court is a limited one. It does not block *all* enforcement of the medical restrictions in the April 3 order against abortion providers. *See* D.E. 138 at 2. Instead, consistent with Dr. Harris' testimony, it prohibits the state from failing to allow healthcare providers to consider and base their decisions as to whether to provide an abortion without delay on certain factors. *See id.* at 2–4. These include whether the patient would lose

5

her legal right to obtain an abortion under Alabama Code § 26-23B-5 if the procedure were delayed until after April 30.  *See id.* at 3.

The state, through Attorney General Marshall and Dr. Harris, appealed.  The state also filed an emergency motion to stay the preliminary injunction pending appeal.

## II

In reviewing a motion to stay a preliminary injunction pending appeal, we consider the following factors: "(1) whether the stay applicant has made a strong showing that it is likely to succeed on the merits, (2) whether the applicant will be irreparably injured absent a stay, (3) whether the issuance of the stay will substantially injure the other parties interested in the proceeding, and (4) where the public interest lies."  *Democratic Exec. Committee of Fla. v. Lee*, 915 F.3d 1312, 1317 (11th Cir. 2019) (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009)).   The first two factors "are the most critical."  *Nken*, 556 U.S. at 434; *Lee*, 915 F.3d at 1317.  "It is not enough that the chance of success on the merits be better than negligible. . . . By the same token, simply showing some possibility of irreparable injury . . . fails to satisfy the second factor."  *Nken*, 556 U.S. at 434–35 (citations and internal quotation marks omitted).

The district court, in granting a preliminary injunction, did not definitively rule on the merits of the case.  Today, we likewise do not conclusively resolve the merits of the state's appeal.  Because a preliminary injunction is reviewed under the deferential abuse of discretion standard, *see Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018), the narrow question for us is whether the state has made a strong showing that the district court abused its discretion.

## III

The state argues that it is "almost certain" to succeed on the merits because (1) the plaintiffs lack standing to bring a pre-enforcement challenge, as they have not demonstrated a

6

credible threat of injury; and (2) the April 3 order is a constitutional emergency measure issued pursuant to the state's police powers. *See* Motion for Stay at 11, 13–19. We consider each argument below.

## A

We have explained that "[w]hen the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." *Am. Charities for Reasonable Fundraising Regulation, Inc. v. Pinellas Cty.*, 221 F.3d 1211, 1214 (11th Cir. 2000) (citations and internal quotation marks omitted). Thus, a plaintiff may establish standing to bring an as-applied/ pre-enforcement challenge by showing that either "(1) [she] was threatened with prosecution; (2) prosecution is likely; or (3) there is a credible threat of prosecution." *Id*. (citation and internal quotation marks omitted).

At this stage, the plaintiffs have established a credible threat of prosecution, a standard we have described as "quite forgiving." *Wollschlaeger v. Governor*, 848 F.3d 1293, 1305 (11th Cir. 2017) (en banc) (citation and internal quotation marks omitted). Dr. Robinson testified that she is concerned that if she violates the April 3 order, she will be subject to misdemeanor charges. *See* D.E. 133 at 166. Indeed, under Alabama law, a violation of the March 27 or April 3 orders is a misdemeanor punishable by a fine of between $25 and $500 per each day of violation. *See* Ala. Code § 22-2-14.

If the state were to abide by Dr. Harris' interpretation of the April 3 order at the preliminary injunction hearing—which would permit the plaintiffs to provide abortion services that they deem necessary in their clinical judgment—it is unlikely that they would face prosecution. But we are

not persuaded that Dr. Harris' interpretation of the order at the preliminary injunction hearing diminishes the plaintiffs' reasonable fear of prosecution.

First, Dr. Harris admitted that his statements about or interpretations of the order do not bind Alabama prosecuting authorities.   Indeed, he testified that he has "no idea" how law enforcement officials would interpret or enforce the April 3 order.   *See* D.E. 133 at 44.   As we have explained, "[m]id-litigation assurances are all too easy to make and all too hard to enforce, which probably explains why the Supreme Court has refused to accept them."   *W. Ala. Women's Ctr. v. Williamson*, 900 F.3d 1310, 1328 (11th Cir. 2018).   *See also Stenberg v. Carhart*, 530 U.S. 914, 940–41 (2000) (declining to accept the attorney general's "narrowing interpretation" of the state's abortion statute as "authoritative" because it did not bind the state courts or local law enforcement authorities).[2]

Second, the state says that the district court's limited preliminary injunction "more-or-less memorializes Dr. Harris' testimony of how the order will be enforced[.]"   Motion for Stay at 19. That is true.   But the fact that the state nevertheless vigorously opposes the preliminary injunction suggests that it does not intend to enforce the April 3 order consistently with Dr. Harris' testimony at the April 6 hearing and may revert to its earlier interpretations.   *See, e.g., Wollschlaeger*, 848 F.3d at 1305 (explaining that we may infer the state's intent to enforce certain provisions of a statute from the fact that it has "vigorously defended the [law] in court" after it was challenged).

Third, the state has not been consistent in its position with respect to what the March 27 and April 3 orders mean.   Dr. Harris' testimony at the April 6 preliminary injunction hearing conflicted with the state's earlier interpretation of the order expressed at the TRO hearing: that the order proscribed abortion procedures unless they are necessary for the mother's life or health.   Dr.

---

[2] The state could have presented the testimony of Attorney General Marshall or another member of his office as to how prosecutorial discretion would be exercised with respect to the April 3 order.   But it did not offer any such testimony.

Harris' testimony also contradicted the state's interpretation of the order stated in the "clarifications" filed on April 5.   Given the state's varied interpretations of the April 3 order, the plaintiffs cannot be forced to guess whether their conduct is prohibited and then face prosecution if they choose incorrectly.   *See id.* at 1306 (explaining that a letter from the Board of Medicine interpreting the challenged law did not diminish the doctors' reasonable fear of prosecution because the letter contradicted earlier positions taken by the Board).[3]

**B**

Turning to the terms of the preliminary injunction, we note at the outset that this is an atypical case.   That is because the state concedes that the substance of the district court's preliminary injunction is consistent with its own (and latest) interpretation of the April 3 order. *See* Motion for Stay at 4 ("[T]he problem is not so much the substance of the district court's addendum to the emergency health order.   The problem is that the district court crafted it at all . . ."); *id.* at 19 (conceding that the injunction "more-or-less memorializes Dr. Harris' testimony of how the order will be enforced").

"The chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated."   *Ne. Fla. Ch. of Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1284 (11th Cir. 1990).   Because of the state's shifting interpretations of the March 27 and April 3 orders, the district court had ample authority to issue a preliminary injunction to preserve the status quo and prevent the state from reverting to its initial and more restrictive interpretations.   *See generally* 11A Charles Alan Wright, Arthur Miller, & Mary Kay Kane, Federal Practice and Procedure § 2948 (3d ed. 2013 & 2019 supp.) (preservation of the status quo through a preliminary injunction "is unobjectionable when used simply to

---

[3] To the extent that the state argues in its reply that its interpretation of the March 27 and April 3 orders has remained consistent throughout, that contention is flatly refuted by the record.

9

articulate the desire to prevent [the] defendant from changing the existing situation to [the] plaintiff's irreparable detriment"). We therefore struggle to see how the state can show a strong likelihood of success on the merits or irreparable harm.

**1**

The state argues that the order is a valid exercise of its power to issue public health orders during an emergency. It relies on *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905), and *Smith v. Avino*, 91 F.3d 105 (11th Cir. 1996), *abrogated on other grounds by Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94 (1998). But just as constitutional rights have limits, so too does a state's power to issue executive orders limiting such rights in times of emergency.

In *Jacobson*, the Supreme Court rejected the defendant's argument that compulsory vaccination violated his Fourteenth Amendment rights, explaining that "a community has the right to protect itself against an epidemic of disease which threatens the safety of its members." 197 U.S. at 27. But its ruling was not an absolute blank check for the exercise of governmental power. The Court explained that "if a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law, it is the duty of courts to so adjudge, and thereby give effect to the Constitution." *Id*. at 31.

Similarly, in *Smith*, we upheld a curfew that was imposed in the aftermath of Hurricane Andrew against the plaintiff's constitutional challenges. *See* 91 F.3d at 107–10. But we did not hold that courts *cannot* review emergency orders or invalidate them when appropriate. Instead, we explained that "when a curfew is imposed as an emergency measure in response to a natural disaster, the scope of review in cases challenging its constitutionality is limited to a determination

10

whether the [executive's] actions were taken in good faith and whether there is some factual basis for the decision that the restrictions . . . imposed were necessary to maintain order." *Id.* at 109 (citations and internal quotation marks omitted). So, while states and the federal government have wide latitude in issuing emergency orders to protect public safety or health, they do not have *carte blanche* to impose any measure without justification or judicial review.

The district court considered *Jacobson* and *Smith*, but read them together with cases holding that the Fourteenth Amendment generally protects a woman's right to terminate her pregnancy. *See* D.E. 137 at 28–45. The Supreme Court established in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 878 (1992) (plurality opinion), that an "undue burden" on a woman's right to have an abortion renders a restriction unconstitutional if the law's "purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability." This standard "requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer." *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2309 (2016).

Reading these two lines of cases together, the district court concluded that the April 3 order (if applied to proscribe abortions unless necessary for the mother's life or health) imposed a "plain, palpable invasion of rights," yet had "no real or substantial relation" to the state's goals. *See Jacobson*, 197 U.S. at 31. *See* D.E. 137 at 28–42. Based on the evidence presented at the preliminary injunction hearing, and its factual findings—which the state does not challenge—the district court was permitted to reach this conclusion and to issue a status quo preliminary injunction to ensure that the state did not deviate from Dr. Harris' interpretation of the April 3 order at the preliminary injunction hearing.

The district court found that "for at least some women, a mandatory postponement until

11

April 30 would operate as a *prohibition* of abortion, entirely nullifying their right to terminate their pregnancies[.]" D.E. 137 at 22–23.  This is because under Alabama law abortion becomes illegal when the probable postfertilization age of the fetus is at least 20 weeks.  *See* Ala. Code § 26-23B-5.  A mandatory postponement until April 30—which is *one month* from when the state initially interpreted the order to apply to abortions on March 30—could thus extend a woman's pregnancy beyond this 20-week boundary, making abortion illegal after that point.  *See* D.E. 137 at 23.

In addition, the district court found that, for other women, "a delay until April 30 will pose a tremendous, and sometimes insurmountable, burden," because of "major logistical hurdles."  *Id.* at 24–25.  For example, Dr. Robinson testified that her clinic is the only abortion facility in Alabama that provides termination of pregnancy beyond 14 weeks of gestational age.  *See id.* at 24; D.E. 133 at 114.  If physicians in Alabama are forced to postpone abortion services until after April 30, she explained that her clinic likely will not have the capacity to care for all of the patients who seek an abortion after that gestational age, but who must have the procedure before the expiration of the 20-week limit under Alabama law.  *See* D.E. 133 at 114–16.  The district court further found that other obstacles women face in seeking to obtain an abortion—such as difficulty traveling to a clinic, receiving necessary time off, arranging child care, or affording an abortion in the first place—would be "greatly exacerbate[d]" by a mandatory delay, particularly "in the midst of a pandemic that has yielded widespread job loss, financial difficulty, and social isolation." D.E. 137 at 25.

Finally, the district court found that for other women, postponing an abortion may cause "serious harm, or a substantial risk of serious harm, to that woman's health," explaining that Dr. Robinson "credibly testified that, for at least some women, even a short delay can make an

abortion (or the ongoing pregnancy) substantially risker." *Id.* at 25–26. The district court relied on Dr. Robinson's testimony that "the risk of a serious complication increases with weeks' gestation," and that "each week that the abortion is delayed, it increases the risk to the patient." D.E. 133 at 107, 111; D.E. 137 at 26. Dr. Robinson summarized a report concluding that "every week that an abortion is delayed [it] increases the risk [of mortality or death in the patient] by approximately 38 percent." D.E. 133 at 110. For patients who are victims of domestic violence or rape, Dr. Robinson testified that delaying the abortion may also result in increased intimate partner violence or an increased emotional and mental toll on the patient. *See id.* at 112.

In light of these effects, the district court concluded that the medical restrictions in the April 3 order—if applied to proscribe abortions unless necessary to protect the health or life of the mother—are substantially likely to be unconstitutional. *See* D.E. 137 at 28. And to the extent that the April 3 order effectively operates as a *prohibition* on a woman's right to obtain an abortion before viability, the district court concluded that it is substantially likely to be unconstitutional as applied. *See* D.E. 137 at 32–33. On this record, the state has not shown a strong likelihood that the district court erred in reaching these conclusions. *See, e.g., Gonzales v. Carhart*, 550 U.S. 124, 146 (2007) ("Before viability, a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy.") (citation and internal quotation marks omitted).

The district court also concluded that, even where the April 3 order does not operate as a complete prohibition, a mandatory *one-month* postponement of abortion is also substantially likely to impose an "undue burden" under *Casey*. *See* D.E. 137 at 35–37. It reached this conclusion based on its findings that the delay would "amplify existing challenges, pose severe health risks, and render abortions functionally unavailable for at least some women," but would only minimally serve the state's interests. *See id.* at 37–38. Based on the district court's underlying and

13

unchallenged factual findings, the state has not shown a strong likelihood of demonstrating error in this regard either.

**2**

The state argues that applying the April 3 order to abortion providers serves three interests: (1) it frees up hospital capacity for the influx of patients suffering from COVID-19; (2) it preserves personal protective equipment (PPE) for medical workers caring for COVID-19 patients; and (3) it slows the spread of the virus by reducing social interactions. *See* Motion for Stay at 2, 10, 19. Dr. Harris testified as to these interests, though in general terms, at the preliminary injunction hearing. *See* D.E. 133 at 10–13, 21. Of course, these interests are presumably served by Dr. Harris' current interpretation of the April 3 order, and the preliminary injunction merely preserves that interpretation—the status quo—while preventing the state from going back to any prior and more restrictive interpretations. So the preliminary injunction advances the state's interests co-extensively with Dr. Harris' interpretation of the order. For the sake of completeness, however, we add the following with respect to the evidence presented at the preliminary injunction hearing on the state's interests.

With respect to the conservation of hospital resources, the district court found that the "medical restrictions are very unlikely to make a significant difference" because "the rate of abortions that require hospitalization is extremely low." D.E. 137 at 40. This finding is supported by Dr. Robinson's testimony that abortions in Alabama are typically not performed in hospitals, that significant complications arise from an abortion procedure less than 0.5% of the time, and that less than 0.01% of complications resulting from an abortion require hospital care. *See* D.E. 133 at 100, 78, 154. Significantly, the state presented no contrary evidence, and Dr. Harris admitted he had "no data" to support the assertion that abortions may result in

14

complications which require emergency medical care and tax the health care system. *See id.* at 54.

The district court also found that "most abortions and related appointments require a limited amount of personal protective equipment . . . and a delayed abortion does not erase even the patient's short-term need for medical care." D.E. 137 at 38. This is because normal prenatal visits and mandatory pre-abortion examinations are permitted to proceed as scheduled under the order. *See id.* at 39. Beyond these appointments, the district court found—again based on Dr. Robinson's testimony—that "abortions themselves only require a limited amount of PPE." *Id.* at 39.

In addition, the district court found that if an abortion is delayed and then does not proceed (e.g., if the delay results in the woman not being able to access an abortion within the permitted time limit under Alabama law), the restrictions "may backfire over time," as prenatal care requires more PPE. *See id.* at 41. For example, Dr. Robinson testified that a typical uncomplicated pregnancy requires 10–13 prenatal visits—all of which require medical providers to use PPE—and a complicated pregnancy would require far more. *See* D.E. 133 at 125–27, 131. Dr. Harris did not disagree. *See id.* at 52. The district court found, based on Dr. Robinson's testimony, that at least some of these needs would emerge before the order expires, especially if it is extended further. *See* D.E. 137 at 41–42. Again, the state presented no contrary evidence.[4]

In view of these factual findings, which are amply supported by the record, the district court did not err in concluding that the burdens imposed by the medical restrictions as interpreted at the TRO hearing are undue under *Casey*, and that they impinge the right to an abortion in a "plain, palpable" fashion under *Jacobson*, 197 U.S. at 31. *See id.* at 42. We note again that at the

---

[4] Although not expressly addressed in the district court's order, the record also reflects that providing certain abortion services (e.g., medication abortions) involves limited social interaction. *See* D.E. 133 at 141–42 (describing the interactions required for surgical and medication abortions).

preliminary injunction hearing the state did not present any evidence that applying the April 3 order to proscribe pre-viability abortions would in fact free up hospital space for COVID-19 patients or PPE for medical providers.   In fact, Dr. Harris admitted that the state "did not attempt" to evaluate how much PPE different types of doctors use "at all."   D.E. 133 at 22.   As the district court noted, with respect to any PPE that is conserved from delaying abortion procedures, the state did not present any evidence regarding how such resources might be used or re-directed to hospitals that are experiencing shortages.   *See* D.E. 137 at 40, n.16.   Based on the record before us, the state's concerns that it would lack hospital space or PPE to treat COVID-19 patients as a result of those resources being utilized for women obtaining abortions are "hypothetical scenarios," as the record is "devoid of evidence that there is a risk that these scenarios would occur" if we do not grant the state's motion for a stay.   *See S. Wind Women's Ctr. LLC v. Stitt*, 2020 WL 1860683, at *3 (10th Cir. 2020) (Lucero, J., concurring).

**3**

The state relies on the Fifth Circuit's decision in *In re Abbott*, -- F.3d --, No. 20-50264, 2020 WL 1685929 (5th Cir. Apr. 7, 2020), and the Eighth Circuit's decision in *In re Rutledge*, -- F.3d --, No. 20-1791, 2020 WL 1933122 (8th Cir. Apr. 22, 2020) (agreeing with *Abbott*).   In *Abbott*, a divided Fifth Circuit panel granted a writ of mandamus directing the district court to vacate a TRO which exempted abortions from a Texas executive order postponing non-essential surgeries and procedures due to the COVID-19 epidemic.   *See Abbott*, 2020 WL 1685929, at *1–2.   In *Rutledge*, a divided Eighth Circuit panel issued a writ of mandamus directing the district court to vacate a TRO which prohibited Arkansas officials from applying to surgical abortions a healthcare directive postponing non-medically necessary surgeries due to the COVID-19 epidemic.   *See Rutledge*, 2020 WL 1933122, at *2.   Assuming without deciding that the majority

16

opinions in *Abbott* and *Rutledge* are persuasive, they are distinguishable for several reasons.

The Fifth and Eighth Circuits respectively concluded that the district courts in *Abbott* and *Rutledge* made several legal errors. The *Abbott* district court failed to consider *Jacobson*, and it also failed to analyze the Texas COVID-19 order under the *Casey* undue-burden test. *See Abbott*, 2020 WL 1685929, at *8, 11. According to the Fifth Circuit, the district court should have "carefully pars[ed]" the evidence to determine whether the order imposed "burdens on abortion that 'beyond question' exceed its benefits in combatting the epidemic Texas now faces." *Id*. at *11. The *Rutledge* district court "summarily" explained that its TRO was consistent with *Jacobson*, but the Eighth Circuit took issue with the TRO because the district court similarly "failed to apply [the] requisite [*Jacobson*] framework and, thus, abused its discretion." *Rutledge*, 2020 WL 1933122, at *5. Here, in contrast, the district court applied both the *Jacobson* framework and the *Casey* undue-burden test. *See* D.E. 137 at 29–33. The district court also carefully weighed the evidence presented at the preliminary injunction hearing, determining that the burdens on abortion created by the state's initial interpretations of the March 27 and April 3 orders far exceeded the orders' benefits in combatting the COVID-19 epidemic. *See id.* at 23–27, 36–42.

In addition, the district court in *Abbott* interpreted Texas' COVID-19 order as an "outright ban" on pre-viability abortions and restrained the state from applying it to abortion procedures altogether. *See Abbott*, 2020 WL 1685929, at *1. The district court in *Rutledge* likewise issued a TRO that flatly prevented state officials from enforcing Arkansas' health directive against surgical abortion providers. *See Rutledge*, 2020 WL 1933122, at *2. Here, however, there is no blanket prohibition of the April 3 order. The state may still require the delay of abortions which providers, in their reasonable clinical judgment, determine can be postponed. The district court's

preliminary injunction maintains the status quo, and is narrowly tailored to balance the state's need to combat the COVID-19 epidemic and the right to access an abortion.[5]

We repeat again—for this is a point worth repeating—that the state agrees that the preliminary injunction is consistent with its latest interpretation of how the April 3 order should be read. *See* Motion for Stay at 4, 19. A litigant who agrees with the substance of an order faces a steep uphill battle in seeking to have that order stayed on appeal. So it is here.

## IV

We deny the motion to stay the district court's preliminary injunction pending appeal. On this record, the state has not made a "strong showing that it is likely to succeed on the merits" of its appeal or that it will be "irreparably injured absent a stay." *Lee*, 915 F.3d at 1317.

**MOTION FOR STAY PENDING APPEAL DENIED.**

---

[5] We note also that both *Abbott* and *Rutledge* are TRO cases. Here, in contrast, we have a preliminary injunction issued after an evidentiary hearing.